[Cite as *State v. Carter-El*, 2025-Ohio-4842.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
# COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | |
| v. | : | No. 114603 |
| VICTORIOUS CARTER-EL, | : | |
| Defendant-Appellant. | : | |

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** October 23, 2025

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-24-690900-B

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, Eric Collins, Kory Roth, and Thomas Rovito, Assistant Prosecuting Attorneys, *for appellee.*

Joseph V. Pagano, *for appellant.*

DEENA R. CALABRESE, J.:

{¶ 1} On October 30, 2024, a Cuyahoga County jury found defendant-appellant Victorious Carter-El ("appellant") guilty of murder, felonious assault, and discharge of a firearm on or near prohibited premises. The trial court entered judgment in accordance with the jury's verdict and imposed a prison term.

Appellant timely appealed, challenging his convictions, sentence, and bindover from juvenile court.  Finding no merit to the appeal, we affirm.

## I. Facts and Procedural History

### A. Initial Proceedings

{¶ 2} This case involves a fatal shooting that occurred in the parking lot of In & Out Beverage at the corner of Lakeview Road and Durant Avenue in Cleveland, Ohio.  Three individuals shot at the victim, purportedly in the course of robbing him.  The victim sustained three gunshot wounds and perished at University Hospitals.  Appellant was charged in juvenile court with two counts of aggravated murder in violation of R.C. 2903.01(A) and (B); three counts of murder in violation of R.C. 2903.02(A) and (B); two counts of aggravated robbery in violation of R.C. 2911.01(A)(1) and (3); and two counts of felonious assault in violation of R.C. 2903.11(A)(1) and (2).  Each count also carried one- and three-year firearm specifications.

{¶ 3} The juvenile court held a bindover hearing on October 2, 2023.  At the hearing, the State presented one witness, Detective Andrew Hayduk, and numerous exhibits, including surveillance video of the shooting.  The video showed three individuals exiting a red Kia, interacting with the victim, and ultimately shooting him.  Detective Hayduk testified that a Shaker Heights police officer helped him identify appellant from the video footage based on the officer's previous interactions with appellant.  (Oct. 2, 2023 juvenile court tr. 33-38.)  Detective Hayduk further testified that DNA matches placed appellant inside the subject vehicle and that a

common firearm linked this shooting to another that occurred in East Cleveland, where appellant was likewise a suspect. The juvenile court subsequently bound appellant over to adult court as mandated by Juv.R. 30, R.C. 2152.10, and 2152.12, docketing an entry finding "that the State has shown venue, age, and some credible evidence of the elements of the offenses as laid out in counts 1 through 9." (Oct. 3, 2023 juvenile court entry.)

{¶ 4} On April 5, 2024, the Cuyahoga County Grand Jury indicted appellant on the same charges. The case proceeded to trial beginning September 20, 2024.

## B. Trial Testimony

{¶ 5} On January 8, 2023, Cleveland police responded to In & Out Beverage in response to a call stating that a male had been shot at the location. The State's first witness, Detective Daniel McCandless, arrived at the scene to find the victim on the ground in front of the store. Body-camera footage depicted the victim still alive but barely responsive. Police and EMS rendered aid at the scene, but the victim, who sustained three gunshot wounds, was pronounced dead at University Hospitals.

{¶ 6} Police collected evidence at the scene, including four shell casings and store surveillance footage. In the surveillance footage, three individuals can be seen exiting a red Kia Soul automobile and speaking to the victim. All three pulled out handguns and shot at the victim, who retreated towards the store and collapsed to the ground.

{¶ 7} Police sought data from the Real Time Crime Center to track the Kia's movements but were unable to locate the vehicle in that manner. The next morning,

however, police spotted the car in the driveway of Quitisha Taborn's home. At trial, Taborn identified codefendant K.M. as the individual seen outside the driver's door on surveillance footage. (Tr. 373.) She claimed not to recognize the other two shooters. (Tr. 379.)

{¶ 8} More importantly, Taborn is the mother of the State's key witness, K.L. Taborn testified that K.L. told her he was a passenger in the vehicle at the time of the robbery. (Tr. 380.) During a police interview, K.L. told police that he "was present for the robbery" but "had remained in the vehicle." (Tr. 699.) K.L. stated that K.M. was driving the vehicle at the time of the incident. (Tr. 699.) K.M. was subsequently arrested.

{¶ 9} The investigation continued with the goal of identifying the remaining two suspects, both of whom had also been captured on surveillance video. Detective Hayduk shared photos with law enforcement personnel and received information regarding appellant. (Tr. 709-710.) He sent a DNA sample from appellant to the lab for testing. According to Detective Hayduk's testimony and that of State's witness Dr. Naris Butt, the sample matched DNA found on the mouth of a Faygo soda bottle found in the vehicle, as well as an interior passenger door handle.

{¶ 10} In January and April 2024, Detective Hayduk and a prosecutor met with K.L. and his attorney for proffer interviews. Detective Hayduk testified that K.L. revealed the name of another suspect, D.M., and further confirmed that appellant was one of the suspects seen on video. (Tr. 713-714.) Detective Hayduk's

subsequent investigation revealed that D.M. and appellant are first cousins. (Tr. 726-728.)

{¶ 11} K.L. testified at trial. He acknowledged that he was given a plea deal in exchange for truthful testimony against all codefendants, including appellant. (Tr. 540-541.) K.L. testified that on the day of the incident, he and K.M. decided to take his mother's red Kia Soul to sell marijuana. They picked up both D.M. and appellant, who got into the back seat of the vehicle. K.L. was familiar with appellant and his appearance because they had previously socialized approximately 15 times. (Tr. 575.)

{¶ 12} As the group drove towards East Cleveland, they "saw somebody [they] could rob." (Tr. 547.) K.L. explained that the victim had a handgun, which they could take and sell, and that the victim was "known to be . . . drunk," which would make it easier to rob him. (Tr. 548 and 560.) According to K.L., the victim was "waving" the handgun when they "first saw him walking down the street." (Tr. 577.) K.L. testified that appellant said "[l]et's take it." (Tr. 549.) They followed the victim, who was on foot. K.L. was in the passenger seat, with K.M. driving. (Tr. 552.) They stopped to "mak[e] a plan . . . [t]o rob him" after he came out of In & Out Beverage. (Tr. 552-553.) The two individuals in the back seat at the time were D.M. and appellant. After parking, K.L. remained in the car while the remaining three individuals exited. (Tr. 555-556.)[1]

---

[1] K.L. testified that at the time of the shooting he stood 6′1″ and weighed approximately 300 pounds. (Tr. 599.) None of the individuals who emerged from the red Kia matched that description.

{¶ 13} K.L., narrating the video-surveillance footage, identified the person wearing a "[b]lue hoodie" as appellant. (Tr. 555.) The face of the individual wearing the blue hoodie is visible in the surveillance video. All three individuals possessed handguns. (Tr. 556-557.) K.L., still referencing the video footage, indicated that appellant waved a bag of marijuana at the victim. After the victim approached them, appellant and the two others drew their handguns, pointing them at the victim. K.L. explained that the group fired upon the victim because "[t]hey saw he reached for his gun." (Tr. 560.) Stills from the surveillance footage depict the person in the blue hoodie, along with two others, standing on the driver's side of the car and pointing their firearms at the victim. (State's exhibit Nos. 432-433.) Two additional stills depict appellant on the opposite side of the car with his gun pointed at the victim as the victim fell to the ground. (State's exhibit Nos. 434-435.) Three bullets struck the victim. At the scene, officers recovered four shell casings of two different calibers, i.e., two 9 mm and two .380. None of the guns involved in the crime were ever located.

{¶ 14} Appellant and K.M. returned to the vehicle, with appellant climbing into the vehicle's passenger side back seat. D.M. fled on foot. (Tr. 561.) In a subsequent conversation with appellant and the other perpetrators the same afternoon, K.L. worried aloud about going to jail "for something that [he] didn't do," and appellant reportedly stated, "[W]e'll all go down together." (Tr. 565.)

{¶ 15} With respect to his first police interview, K.L. testified that he refused to cooperate fully, even concealing some facts with his mother. (Tr. 568-570.) He

stated that he thought he "was doing the right thing" by "keeping the street code." (Tr. 597.) During later interviews with police, in the course of two proffers, he was more forthcoming, including identifying appellant as one of the shooters. (Tr. 570-571.) He further identified D.M. as the final individual involved in the fatal shooting. (Tr. 571-572.)

{¶ 16} K.L. testified that following the proffer interview in which he positively identified appellant as one of the shooters, he had encountered appellant at the detention facility, even though they were generally separated. Appellant reportedly called K.L. "a snitch" every time they crossed paths. (Tr. 576 and 599.)

{¶ 17} Detective Hayduk testified concerning his investigation of the homicide. Narrating the video-surveillance footage, he pointed out that the red Kia Soul moved erratically, appearing and disappearing from the camera's field of view multiple times. This indicated to Detective Hayduk that its occupants were "casing that store and stalking the victim." (Tr. 689.) He further testified that after shooting began on the driver's side of the vehicle, appellant moved to the passenger side and aimed his weapon at the victim, who had his hands up. (Tr. 740.) According to Detective Hayduk, "[t]he gun appear[ed] like it might be cycling" and the victim fell to the ground. (Tr. 742.)

## C. Rule 29 Motions and Sentencing

{¶ 18} The State rested subject to the admission of exhibits. Appellant's trial counsel moved for acquittal under Crim.R. 29 with respect to all counts of the indictment. The trial court granted the motion with respect to Count 1, aggravated

murder in violation of R.C. 2903.01(A), finding "a lack of evidence as it applies to prior calculation and design." (Tr. 860.) The trial court denied the Crim.R. 29 motion in all other respects. Appellant rested without calling witnesses, and the trial court denied appellant's renewed Crim.R. 29 motion. Following the jury charge and closing arguments, the jury deliberated and returned guilty verdicts on all remaining counts of the indictment, as well as the associated firearm specifications.

{¶ 19} The trial court sentenced appellant on October 30, 2024. At the sentencing hearing, appellant's trial counsel expressly argued "that adolescents lack the cognitive development and impulse control of adults," that the United States Supreme Court had recognized as much, and that the Ohio Revised Code now specifically required the trial court to weigh aspects associated with an offender's age at the time of the offense in determining an appropriate sentence. (Tr. 971-972.) Appellant's trial counsel pointed out that appellant was 16 at the time of the offense and indicated that the court must consider "that age's hallmark features, including intellectual capacity, immaturity, impetuosity, and a failure to appreciate risks and consequences." (Tr. 972.)

{¶ 20} The trial court stated that "the record should reflect that I am taking into consideration the mandate set forth in 2929.19(B)(1) — (B)(1)(b)(i) through [(v)]," including "the chronological age of the offender at the time of the offense and the age's hallmark features." (Tr. 973.) It indicated that it would "comply with the mandates" of the statute, further remarking that it did "believe in what they're saying about the brain development, but that statute also requires that the Court

weigh that against the other factors." (Tr. 974.) The court ultimately stated that it "considered his age" and found that it did not "find that that mitigates his conduct." (Tr. 977.)

{¶ 21} All counts merged for sentencing, and the State elected to proceed on Count 2, aggravated murder in violation of R.C. 2903.01(B). The trial court imposed a sentence of 30 years to life for aggravated murder. Because of the requirement that two of the firearm specifications must be run consecutively to each other, the trial court merged the one- and three-year firearm specifications attached to Counts 2 and 3, imposing firearm specification sentences of three years on Count 2 and three years on Count 3, to be served consecutively to each other for a total of six years on the firearm specifications, all served prior to the sentence of 30 years to life on the underlying count of aggravated murder.

{¶ 22} The trial court imposed a sentence of 36 years to life. Due to his age at the time of the offense, however, appellant is eligible to be considered for parole after serving 25 years.

{¶ 23} This timely appeal followed.

## II. Assignments of Error

{¶ 24} Appellant presents four assignments of error for our review:

Assignment of Error I: The trial court erred when it denied appellant's motion for acquittal under Crim.R. 29 because the state failed to present sufficient evidence to establish the elements necessary to support the convictions beyond a reasonable doubt.

Assignment of Error II: Appellant's convictions are against the manifest weight of the evidence.

Assignment of Error III: The trial court committed reversible error by failing to afford the juvenile offender's age any weight as a mitigating factor when imposing a sentence for aggravated murder, in violation of Ohio law and constitutional principles. R.C. 2929.03 and 2929.12; U.S. Const. Amend. VIII; XIV.

Assignment of Error IV: The juvenile court erred in finding that mandatory bindover was required pursuant to Juv.R. 30 under Ohio law.

{¶ 25} Finding no merit to the appeal, we overrule appellant's assignments of error and affirm his convictions and sentence.

## III. Analysis

### A. Sufficiency of the Evidence

{¶ 26} In his first assignment of error, appellant argues there was insufficient evidence to support his convictions for aggravated murder with firearm specifications and that the trial court therefore erred in denying his Crim.R. 29 motions for acquittal.[2]

{¶ 27} This court has recently reaffirmed that "[a]n appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *Spencer* at ¶ 15, citing *State v. Murphy*, 91 Ohio St.3d 516 (2001); *State v. Williams*, 2025-Ohio-2593, ¶ 26 (8th Dist.); *State v. Lynch*, 2025-

---

[2] Appellant concedes that pursuant to current precedent, this court's sufficiency review is limited to addressing those counts where there has been a conviction and a sentence imposed. *State v. Spencer*, 2024-Ohio-5809, ¶ 14 (8th Dist.). He therefore challenges his convictions under Counts 2 and 3, noting (for purposes of any further review) that he contends there was insufficient evidence as to all counts in the indictment. The same limitation applies to our manifest-weight analysis below. *Id.* at ¶ 25.

Ohio-2769, ¶ 49 (8th Dist.). The appellate court views the evidence "'in a light most favorable to the prosecution'" to determine whether "'any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *Spencer* at ¶ 15, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus; *Williams* at ¶ 26. The inquiry is whether the State has met its "burden of production" at trial. *State v. Dyer*, 2007-Ohio-1704, ¶ 24 (8th Dist.); *Lynch* at ¶ 49.

{¶ 28} "'In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law.'" *Cleveland v. Williams*, 2024-Ohio-3102, ¶ 10 (8th Dist.), quoting *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997); *see also Cleveland v. Neal*, 2024-Ohio-1467, ¶ 26 (8th Dist.); *Lynch* at ¶ 49. Appellate courts are not to assess "whether the State's evidence *is to be believed*, but whether, *if believed*, the evidence against a defendant would support a conviction." (Emphasis added.) *Dyer* at ¶ 24; *Lynch* at ¶ 49. In considering the sufficiency of the evidence, we do not independently weigh the evidence, because "the evaluation of the weight of the evidence and credibility of witnesses are jury issues." *State v. Hill*, 75 Ohio St.3d 195, 205 (1996). *See also State v. Mitchell*, 2007-Ohio-3896, ¶ 35 (8th Dist.); *State v. Agee*, 2013-Ohio-5382, ¶ 95 (7th Dist.) ("[C]redibility is generally the province of the jury who sits in the best position to assess the weight of the evidence and credibility of the witnesses whose gestures, voice inflections, and demeanor are personally observed.").

{¶ 29} "'Proof of guilt may be made by circumstantial evidence, real evidence, and direct evidence, or any combination of the three, and all three have equal probative value.'" *Lynch* at ¶ 50, quoting *State v. Zadar*, 2011-Ohio-1060, ¶ 18 (8th Dist.), citing *State v. Nicely*, 39 Ohio St.3d 147, 151 (1988); *Jenks* at 272.

{¶ 30} Appellant attacks the sufficiency of the evidence on two grounds. First, he generally argues that there was insufficient evidence of identity. Second, he contends that there was insufficient evidence that he purposely caused the victim's death while committing or attempting to commit aggravated robbery, the basis for the aggravated murder charge in Count 2. We find both arguments unpersuasive.

{¶ 31} The jury heard the testimony of K.L. and viewed surveillance video and associated stills from the scene of the crime. The video captured the lead up to the incident, with the red Kia Soul circling in and out of view and ultimately parking under one of the cameras, as well as the shooting itself. K.L. testified that he was in the vehicle. He identified the individual in the blue hoodie as appellant, further testifying that he had previously socialized with appellant approximately 15 times. The face of the person wearing the blue hoodie is visible in the video footage and in the stills. That same individual can be seen leaving the car, engaging with the victim, and drawing and pointing his gun at the victim along with the other two assailants as the group opens fire. As the victim attempted to flee, the same individual moved to the other side of the car and again pointed his firearm at the victim, appearing to fire. K.L. testified, "They shot him," clarifying that "they" meant all three of the

armed individuals. The victim sustained three bullet wounds, and four shell casings were found at the scene. DNA evidence corroborated K.L.'s claim that appellant had been in the vehicle, and there was further testimony that appellant was the first cousin of another assailant, D.M. The State's evidence, if believed, was sufficient to establish appellant's identity as one of the perpetrators.

{¶ 32} The State's evidence was also sufficient to establish the elements of aggravated robbery and the associated aggravated-murder count. K.L. testified that the individuals in the car targeted the victim because they assumed he might be drunk, making him an easy target. K.L. testified that they saw the victim had a handgun and that appellant specifically said, "Let's take it." (Tr. 549.) According to his testimony, they next concocted a robbery plan and finally executed it. They stopped the vehicle because they were "making a plan . . . [t]o rob him." (Tr. 552.) The plan, simply put, was "[t]o wait until he come out and rob him." (Tr. 553.) Asked for more details, K.L. testified the plan was to "[p]ut a gun to him and tell him give you whatever you want from him." (Tr. 554.) They passed on the opportunity to rob another customer, seen on video, not only because they did not think he had anything but also because they "had already made a plan basically." (Tr. 557.) They drew the victim into their orbit by asking if he wanted to buy marijuana. K.L. testified it went from a robbery to a shooting because they saw the victim reach for his gun. (Tr. 560.)

{¶ 33} The State also points to the testimony of Detective Hayduk, who opined that the extensive surveillance footage of the Kia erratically circling

suggested the group was "casing that store and stalking the victim." (Tr. 689.) K.L.'s testimony alone, however, was sufficient to establish that what transpired was a robbery that quickly escalated to a homicide.

{¶ 34} As noted above, we do not independently weigh the evidence in our sufficiency analysis. *Hill*, 75 Ohio St.3d at 205. There was sufficient evidence to convict appellant of the charged offenses. The State's evidence, if believed, supported findings that appellant committed the charged offenses. The State met its burden of production, and a rational trier of fact could find the essential elements of the crimes were proven beyond a reasonable doubt. *Dyer*, 2007-Ohio-1704, at ¶ 24 (8th Dist.); *Spencer*, 2024-Ohio-5809, at ¶ 15 (8th Dist.). Appellant's first assignment of error is overruled.

## B. Manifest Weight of the Evidence

{¶ 35} In his second assignment of error, appellant argues that his conviction was against the manifest weight of the evidence. "In contrast to a sufficiency argument, a manifest weight challenge questions whether the state met its burden of persuasion." *State v. Hill*, 2013-Ohio-578, ¶ 32 (8th Dist.); *State v. Shirley*, 2025-Ohio-1064, ¶ 21 (8th Dist.). In our manifest-weight analysis, we "must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving conflict in the evidence, the trier of fact *clearly lost its way* and *created such a miscarriage of justice* that the conviction must be reversed and a new trial ordered." (Emphasis added.) *Spencer* at ¶ 26, citing *Thompkins*, 78 Ohio St.3d at 387.

{¶ 36} An appellate court will reverse on manifest weight "'only in the exceptional case in which the evidence weighs heavily against the conviction.'" *State v. McLoyd*, 2023-Ohio-4306, ¶ 40 (8th Dist.), quoting *Thompkins* at 387; *Williams*, 2025-Ohio-2593, at ¶ 41 (8th Dist.). This is because "in a manifest-weight review, the weight to be given the evidence and the credibility of the witnesses are primarily for the finder of fact." *State v. Metz*, 2019-Ohio-4054, ¶ 70 (8th Dist.); *see also Cleveland v. Johns*, 2024-Ohio-3301, ¶ 24 (8th Dist.). Indeed, an appellate court "'may not substitute its own judgment for that of the finder of fact.'" *Id.* at ¶ 24, quoting *State v. Harris*, 2021-Ohio-856, ¶ 33 (8th Dist.).

{¶ 37} The jury was in the best position to judge the credibility of the State's key witness, K.L. At the outset of his testimony, K.L. testified extensively to the details of the plea agreement he obtained in exchange for his testimony. He then testified extensively concerning appellant's involvement in the crime, including identifying appellant in the video-surveillance footage and testifying that appellant and the others had planned to rob the victim. In the video and stills, the person wearing the blue hoodie does not have his face covered. In determining whether to trust K.L.'s identification testimony, therefore, the jury could compare the surveillance footage and selected stills to appellant's face.[3]

---

[3] In his sufficiency argument, appellant suggested that because Detective Hayduk could not independently identify individuals in the surveillance video without assistance from others such as K.L., it is impossible to identify appellant as the person wearing the blue hoodie in the video. (Appellant's brief at p. 12.) The cited portions of Detective Hayduk's testimony, however, concerned steps taken to ultimately identify all suspects. Having reviewed the surveillance footage and stills, the features of the individual in the blue

{¶ 38} Further with respect to identity, the jury had the benefit of circumstantial evidence of appellant's DNA on the car itself and on a Faygo soda bottle recovered from the back seat where appellant was sitting. This corroborated K.L.'s identification of appellant as one of the individuals who planned and participated in a robbery that escalated to a homicide. Additional DNA testing also lent credibility to K.L.'s overall testimony. For example, testing confirmed that certain DNA found inside the vehicle was D.M.'s. Prior to that scientific identification, however, K.L. had independently identified D.M. as one of the suspects seen on video, including through a photo lineup.

{¶ 39} Appellant attacked K.L.'s credibility at trial, pointing not only to the plea deal but to his initial reluctance to identify suspects at the outset of the investigation. K.L., however, explained to the jury that he was initially engaged in a misguided effort to keep "the street code" by not "snitching." He also testified that after he made a plea deal with the State, appellant called him a "snitch" whenever they crossed paths in the detention center — not a liar, but a snitch.

{¶ 40} The jury was free to weigh whether K.L.'s narrative survived the extensive cross-examination designed to undermine his credibility. In addition, the trial court gave the jury a specific instruction on accomplice testimony. It instructed the jury that "[t]estimony of a person who you find to be an accomplice should be viewed with grave suspicion and weighed with great caution." (Tr. 874.) As this

---

hoodie, identified by K.L. as appellant, appear sufficiently distinct for the jury to have compared the video to appellant's appearance at trial.

court wrote in *Johns*, "[t]he trier of fact may 'believe or disbelieve any witness or accept part of what a witness says and reject the rest.'" *Johns*, 2024-Ohio-3301, at ¶ 24 (8th Dist.), quoting *Metz*, 2019-Ohio-4054, at ¶ 70 (8th Dist.); *see also State v. Harris*, 2025-Ohio-4374, ¶ 36 (8th Dist.).

{¶ 41} Having independently reviewed the entire record, we cannot conclude that this is the exceptional case in which the jury lost its way and created a manifest miscarriage of justice. Appellant's second assignment of error is overruled.

## C. Sentencing

{¶ 42} In his third assignment of error, appellant argues that the trial court's sentence violated the Eighth Amendment to the United States Constitution, R.C. 2929.03, and 2929.12. Specifically, appellant contends that the trial court failed to give appropriate weight to his young age as a mitigating factor.

{¶ 43} Appellant did not object to his sentence on constitutional grounds at the trial-court level and has therefore waived any constitutional arguments. *State v. Woods*, 2024-Ohio-467, ¶ 118 (8th Dist.).

{¶ 44} With respect to appellant's statutory challenge, we review felony sentences under the standard set forth in R.C. 2953.08(G)(2), which provides that an appellate court may increase, reduce, modify, or vacate and remand a felony sentence if the court clearly and convincingly finds either that the record does not support the sentencing court's findings, or the sentence is otherwise "contrary to law." *State v. Spencer*, 2023-Ohio-3359, ¶ 20 (8th Dist.), citing *State v. Marcum*, 2016-Ohio-1002. As this court wrote in *Spencer*:

> When formulating a sentence for a criminal offense, a trial court is directed to consider specific factors outlined under R.C. 2929.11 and 2929.12. Under R.C. 2929.11(A), "the sentencing court shall consider the need for incapacitating the offender, deterring the offender and others from future crime, rehabilitating the offender, and making restitution to the victim of the offense, the public, or both." Similarly, R.C. 2929.12 contains a lengthy list of factors that must be considered "regarding the offender, the offense, or the victim" to determine whether the offender's conduct is more serious or less serious than conduct normally constituting the offense and to determine whether the offender is more or less likely to commit future crimes.

*Spencer* at ¶ 21.

{¶ 45} R.C. 2929.11 and 2929.12, however, are not fact-finding statutes. While "'the trial court must "consider" the factors, it is not required to make specific findings on the record regarding its consideration of those factors, even when imposing a more-than-minimum sentence.'" *Id.* at ¶ 22, quoting *State v. Artis*, 2022-Ohio-3819, ¶ 13 (8th Dist.). Consideration of the factors is presumed unless the defendant "'affirmatively shows otherwise,'" and a trial court's statement in its sentencing entry "'that it considered the required statutory factors is sufficient to fulfill its obligations under R.C. 2929.11 and 2929.12.'" *Spencer* at ¶ 22, quoting *Artis* at ¶ 13. *See also State v. Pate*, 2021-Ohio-1089, ¶ 6 (8th Dist.); *State v. Wright*, 2018-Ohio-965, ¶ 16 (8th Dist.); *State v. Sutton*, 2015-Ohio-4074, ¶ 72 (8th Dist.); *State v. Clayton*, 2014-Ohio-112, ¶ 9 (8th Dist.).

{¶ 46} "Ordinarily, if a sentence falls within the terms of a valid statute, it cannot constitute cruel and unusual punishment." *Woods*, 2024-Ohio-467, at ¶ 121 (8th Dist.). The Ohio Supreme Court, however, has held that "a trial court must separately consider the youth of a juvenile offender as a mitigating factor before

imposing a life sentence under R.C. 2929.03, even if that sentence includes eligibility for parole." *State v. Patrick*, 2020-Ohio-6803, ¶ 2.  Furthermore, and "[r]elevant to the circumstances presented in this case, R.C. 2929.19(B)(1)(b), effective on April 12, 2021, requires the trial court to consider additional mitigating factors when, as here, the offender was under the age of 18 at the time the subject offense was committed." *Spencer* at ¶ 23.  In relevant part, the statute provides:

> (1) At the sentencing hearing, the court, before imposing sentence, shall do all of the following:
>
> . . .
>
> (b) If the offense was committed when the offender was under eighteen years of age, in addition to other factors considered, consider youth and its characteristics as mitigating factors, including:
>
> (i) The chronological age of the offender at the time of the offense and that age's hallmark features, including intellectual capacity, immaturity, impetuosity, and a failure to appreciate risks and consequences;
>
> (ii) The family and home environment of the offender at the time of the offense, the offender's inability to control the offender's surroundings, a history of trauma regarding the offender, and the offender's school and special education history;
>
> (iii) The circumstances of the offense, including the extent of the offender's participation in the conduct and the way familial and peer pressures may have impacted the offender's conduct;
>
> (iv) Whether the offender might have been charged and convicted of a lesser offense if not for the incompetencies associated with youth, such as the offender's inability to deal with police officers and prosecutors during the offender's interrogation or possible plea agreement or the offender's inability to assist the offender's own attorney;
>
> (v) Examples of the offender's rehabilitation, including any subsequent growth or increase in maturity during confinement.

R.C. 2929.19(B)(1)(b).

{¶ 47} In *Spencer*, 2023-Ohio-3359 (8th Dist.), this court held that the mandate of R.C. 2929.19 (that the trial court consider specific factors) was similar to the language of R.C. 2929.11 and 2929.12, and that therefore "'the trial court need not specify findings regarding the factors listed in R.C. 2929.19(B)(1)(b).'" *Spencer* at ¶ 24, quoting *State v. Spears*, 2023-Ohio-187, ¶ 40 (5th Dist.). *See also State v. Billips*, 2025-Ohio-108, ¶ 73 (8th Dist.). Our review is therefore limited to whether the record "'affirmatively shows the court failed to consider those factors.'" *Spencer* at ¶ 24, quoting *Spears* at ¶ 40.

{¶ 48} The trial court in *Spencer* made the following remarks concerning the defendant's youth:

> Mr. Spencer, *I do take into consideration your age*, I do take into consideration your mental health issues and your life circumstances, but the victims were very clear and echoed to this court the second that you had the opportunity to escape that mental institution where we're trying to give you rehabilitation, we were trying to work with you, you plotted and escaped and then you ran and you hid from the police. And you tried to escape even more. Your mother is right. You do know right from wrong. And you knew each time this is wrong. And when you were using credit cards after raping people and stealing from them, there are going to be severe consequences. I cannot believe this conduct, 30 years being in this business I cannot believe that your conduct and your spree and your buddies going around and committing all of these offenses. You've ruined so many things, your actions not only ruined their lives, ruined your life, they ruined all of ours in society. That's what you've done. It's unconscionable what you did.

(Emphasis added.) *Spencer* at ¶ 25. This court found that the trial court had adequately complied with the mandates of R.C. 2929.19(B)(1)(b):

> After careful consideration, we find the trial court adequately complied with its obligation to carefully consider Spencer's "youth and its characteristics as mitigating factors" before imposing a sentence. Here,

the record reflects that in formulating Spencer's sentence, the trial court expressly considered the circumstances of Spencer's offenses, as well as Spencer's individual circumstances, including his age and maturity, his mental and intellectual capacity, his home life, and his ability to appreciate the risks and associated consequences of his conduct. The trial court went on to consider the overriding principles and purposes of felony sentencing, and "the relevant sentencing guidelines provided in R.C. 2929.11, 2929.12, 2929.13, as well as 2929.19." (Tr. 96-97.) Under these circumstances, we are unable to conclude that Spencer's sentence is clearly and convincingly contrary to law.

*Id.* at ¶ 26.

{¶ 49} Viewing the present case through the lens of *Spencer*, we likewise find that the trial court adequately complied with its obligation to carefully consider appellant's "youth and its characteristics as mitigating factors" prior to imposing a sentence. Indeed, the record in the present case appears to be even more explicit than in *Spencer*. The trial court expressly stated that "the record should reflect that I am taking into consideration the mandate set forth in 2929.19(B)(1) — (B)(1)(b)(i) through [(v)]," including "the chronological age of the offender at the time of the offense and the age's hallmark features." (Tr. 973.) The court also recited the remaining factors specified in R.C. 2929.19(B)(1)(b), affirming that it would "comply with the mandates" of the statute and further remarking that it did "believe in what they're saying about the brain development[.]" (Tr. 973-974.) The court also indicated that it reviewed the presentence-investigation report. (Tr. 961.) Our independent review of the presentence-investigation report confirms that it summarized appellant's upbringing, substance-abuse history, social activities, peer associations, criminal attitudes and behavioral patterns, and other relevant factors.

Appellant's trial counsel confirmed he had reviewed the report and that it was accurate to the best of his knowledge. (Tr. 961.) The trial court, after confirming it had also considered the sentencing factors under R.C. 2929.11 and 2929.12 in addition to the mandates of R.C. 2929.19(B)(1)(b), ultimately stated that it "considered his age" and found that it did not "find that that mitigates his conduct." (Tr. 977.)

{¶ 50} We agree with the State that *consideration* of a youth offender's age is all that is required, not that the offender's age be given any specific weight or that the statutory framework requires a reduced sentence. This conclusion is bolstered by *Spencer*, where the trial court considered the defendant's age but appeared to give it little weight in light of the remaining circumstances of the case. This court's decision in *Billips* likewise did not suggest that a trial court is required to give the offender's age any specific weight. In *Billips*, this court wrote that "during the sentencing hearing the trial court stated on the record that it considered Billips's age as it was required to do as a matter of law" and that therefore "Billips has not shown that the trial court did not consider his age, and his sentence is not contrary to law in that respect." *Billips*, 2025-Ohio-108, at ¶ 73 (8th Dist.). *See also Patrick*, 2020-Ohio-6803, at ¶ 42 ("We conclude that the sentencing court failed to articulate on the record whether, and how, it considered Patrick's youth in sentencing."). In addition, appellant has cited no cases suggesting that anything more than consideration is required, i.e., no cases holding that a trial court is required to reduce a youthful offender's sentence or give the offender's age any specific weight.

**{¶ 51}** The sentencing transcript reflects that the trial court adequately complied with its statutory obligation to consider appellant's age as a mitigating factor prior to imposing sentence. Appellant's third assignment of error is overruled.

### D. Bindover

**{¶ 52}** In his fourth assignment of error, appellant argues that the juvenile court erred in finding that mandatory bindover was required pursuant to Juv.R. 30 under Ohio law. His argument again centers around his identity as one of the perpetrators captured on surveillance footage. We find appellant's arguments unpersuasive.

**{¶ 53}** In relevant part, R.C. 2152.12(A)(1)(a)(i) states:

> After a complaint has been filed alleging that a child is a delinquent child for committing one or more acts that would be an offense if committed by an adult, if any of those acts would be aggravated murder, murder, attempted aggravated murder, or attempted murder if committed by an adult, the juvenile court at a hearing shall transfer the case if . . . [t]he child was sixteen or seventeen years of age at the time of the act charged that would be aggravated murder, murder, attempted aggravated murder, or attempted murder and there is probable cause to believe that the child committed the act charged.

**{¶ 54}** R.C. 2152.10(A)(1)(a) states that "[a] child who is alleged to be a delinquent child is eligible for mandatory transfer and shall be transferred as provided in [R.C. 2152.12]" where "[t]he child is charged with a category one offense and . . . [t]he child was sixteen years of age or older at the time of the act charged." Aggravated murder and murder under R.C. 2903.01 and 2903.02, respectively, are "category one" offenses. R.C. 2152.02(AA).

{¶ 55} "[I]f a child is eligible for mandatory bindover and if probable cause exists to believe that the juvenile committed the act charged, the juvenile court must enter an order of transfer." *In re J.R.*, 2021-Ohio-2272, ¶ 28 (8th Dist.), citing *In re C.G.*, 2012-Ohio-5286, ¶ 29 (8th Dist.); *see also In re J.C.*, 2024-Ohio-5918, ¶ 20 (8th Dist.).

{¶ 56} This court recently summarized the standard of review in mandatory bindover cases:

> A reviewing court should "review the juvenile court's findings of fact for abuse of discretion and review its conclusions of law de novo." *In re A.J.S.*, 2008-Ohio-5307, ¶ 1, 120 Ohio St.3d 185, 897 N.E.2d 629. "We defer to the juvenile court's determinations regarding witness credibility, reviewing those determinations for abuse of discretion." *State v. Shirilla*, 2024-Ohio-4674, ¶ 151 (8th Dist.). In reviewing the trial court's factual findings for an abuse of discretion we consider whether the court exercised "its judgment in an unwarranted way regarding a matter over which it has discretionary authority." *Johnson v. Abdullah*, 166 Ohio St.3d 427, 2021-Ohio-3304, ¶ 35, 187 N.E.3d 463. However, "whether the state has produced sufficient evidence to support a finding of probable cause in a mandatory-bindover proceeding is a question of law, and [is reviewed] de novo." *In re A.J.S.* at ¶ 47, citing *State v. Consilio*, 2007-Ohio-4163, 114 Ohio St.3d 295, 871 N.E.2d 1167.

*In re J.C.* at ¶ 21.

{¶ 57} As the State notes, appellant does not dispute that the charges qualified for mandatory bindover pursuant to R.C. 2152.10 and 2152.12. He also does not contend that the juvenile court applied an incorrect probable-cause standard. To establish probable cause in a mandatory bindover proceeding, "the state has the burden to provide sufficient credible evidence on the elements of the offense to warrant going forward with the charge." *In re J.R.* at ¶ 31. While the State

"must provide credible evidence that raises more than a mere suspicion of guilt," it "need not provide evidence proving guilt beyond a reasonable doubt." (Cleaned up.) *Id. See also In re D.M.*, 2014-Ohio-3628, ¶ 10; *State v. Iacona*, 93 Ohio St.3d 83, 93 (2001). "The state is only required to present 'sufficient credible evidence' to establish probable cause." *In re B.A.T.*, 2023-Ohio-3366, ¶ 19 (8th Dist.), quoting *State v. Martin*, 2022-Ohio-4175, ¶ 30.

{¶ 58} "'Probable cause is a flexible concept grounded in fair probabilities which can be gleaned from considering the totality of the circumstances.'" *In re J.R.*, 2021-Ohio-2272, at ¶ 32 (8th Dist.), quoting *In re B.W.*, 2017-Ohio-9220, ¶ 20 (7th Dist.). As this court emphasized in *In re J.R.*, which likewise included an identification made by a nontestifying individual:

> Given that a probable cause hearing is non-adjudicatory, the evidence presented at a probable cause hearing need not meet the same standards required for admissibility at trial. Confrontation clause standards for the admissibility of evidence and the Ohio Rules of Evidence do not apply to probable cause hearings.

*In re J.R.* at ¶ 37, citing *State v. Powell*, 2021-Ohio-200, ¶ 23 (4th Dist.), citing *State v. Burns*, 2020-Ohio-3966, ¶ 74 (8th Dist.). *See also In re B.A.T.* at ¶ 24.

{¶ 59} At the bindover hearing, the State called Detective Hayduk, who testified regarding the video-surveillance footage of the homicide and certain forensic evidence. With respect to identity, Detective Hayduk testified to his communications with Shaker Heights police officer Johnnaya Norton. Appellant had been arrested by Shaker Heights police during a traffic stop and was found to be carrying a firearm that matched shell casings in an East Cleveland shooting that

occurred in January 2023. Certain shell casings at the East Cleveland scene matched casings found at the In & Out Beverage homicide scene, and an individual with the same first name as one of appellant's codefendants in this case, K.M., was listed as a suspect in the East Cleveland shooting along with appellant. (Oct. 2, 2023 juvenile court tr. 20-22 and 55-56.) Detective Hayduk sent Officer Norton "photographs from the scene in an attempt to ID any of the individuals caught on camera." (Oct. 2, 2023 juvenile court tr. 34.) The stills provided, identified as State's exhibit Nos. 43-54, depict all three perpetrators, not just appellant. Hayduk testified that Officer Norton identified the person in the blue hoodie as appellant. He further testified regarding forensic links between the red Kia and appellant (i.e., DNA found on the vehicle and on a Faygo soda bottle) and the referenced shell casings that tied a gun to both the shooting in East Cleveland and the shooting in this case.

{¶ 60} The juvenile court found that "based on the totality of the evidence," including the DNA evidence and the commonality of a handgun across crime scenes, there was probable cause for bindover. (Oct. 2, 2023 juvenile court tr. 77-78.) The juvenile court actually minimized its reliance on the surveillance stills, indicating "that's not the best photo," and did not mention the identification by Shaker Heights Officer Norton. It bluntly stated, "[Y]ou don't have to." (Oct. 2, 2023 juvenile court tr. 78.)

{¶ 61} The testimony and exhibits, including forensic evidence, were sufficient to show a "fair probability" that appellant committed the charged category

one offenses.  *See In re J.R.*, 2021-Ohio-2272, at ¶ 32 (8th Dist.).[4]  Appellant's arguments to the contrary essentially invite us to conduct a manifest-weight review.  "We do not apply a manifest-weight-of-the-evidence standard of review," however, because "the Ohio Supreme Court [has] explained that it is not possible to conduct a manifest-weight review of the evidence presented during the probable-cause portion of a juvenile-bindover hearing because the state is not required to marshal all of its evidence at the probable-cause phase of the proceedings."  *In re B.A.T.*, 2023-Ohio-3366, at ¶ 19 (8th Dist.), citing *Martin*, 2022-Ohio-4175, at ¶ 30.  "[T]he juvenile court's role in the bindover hearing is that of a gatekeeper as opposed to the ultimate trier of fact."  *In re B.A.T.* at ¶ 19, citing *Martin* at ¶ 31.

{¶ 62} Appellant's fourth assignment of error is overruled.

{¶ 63} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.  The defendant's convictions having been affirmed, any bail pending appeal is terminated.  Case remanded to the trial court for execution of sentence.

---

[4] The juvenile court also properly found that the State presented sufficient evidence to support mandatory bindover on the charged category two offenses pursuant to R.C. 2152.12(A)(1)(b)(ii).  In addition to being 16 years of age or older, appellant was "alleged to have had a firearm on or about the child's person or under the child's control while committing the act charged and to have displayed the firearm, brandished the firearm, indicated possession of the firearm, or used the firearm to facilitate the commission of the act charged."  R.C. 2152.10(A)(2)(b).

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
DEENA R. CALABRESE, JUDGE

EILEEN T. GALLAGHER, P.J., and
EMANUELLA D. GROVES, J., CONCUR