[Cite as *State v. Washington*, 2025-Ohio-5755.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
# COUNTY OF CUYAHOGA

STATE OF OHIO, :

    Plaintiff-Appellee, :

                              No. 114502

    v. :

BRAYLON WASHINGTON, :

    Defendant-Appellant. :

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** December 24, 2025

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-23-686230-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Brad Meyer, Assistant Prosecuting Attorney, *for appellee.*

Patituce & Associates, LLC, and Catherine Meehan, *for appellant.*

LISA B. FORBES, P.J.:

{¶ 1} Braylon Washington ("Washington") appeals his convictions for criminal-gang activity, two counts of felonious assault, having weapons while under disability, two counts of attempted murder, improperly handling firearms in a motor

vehicle, discharge of a firearm on or near prohibited premises, and four firearm specifications. For the reasons below, we affirm.

## I. Facts and Procedural History

{¶ 2} This case arises from several incidents involving the "Harvard Mob," a gang operating in Cleveland. The crimes alleged spanned approximately 14 months, during which Washington was under the age of 18.

{¶ 3} The State filed a complaint against Washington in the Cuyahoga County Court of Common Pleas, Juvenile Division, on October 25, 2023. Of the 23 counts against Washington, 21 related to a convenience-store shooting on April 27, 2023, including six counts of attempted murder, which, if charged against an adult would have amounted to first-degree felonies in violation of R.C. 2923.02/2903.02(A).

### A. Probable-Cause Hearing

{¶ 4} Also on October 25, 2023, the juvenile court held a probable-cause hearing to determine whether to transfer the case to the General Division of the Cuyahoga County Court of Common Pleas. At the hearing, Matthew Zone ("Det. Zone") testified that he was a detective for the Cleveland Division of Police and that he had investigated the Harvard Mob. He identified social-media accounts associated with the gang's members and obtained and executed warrants to search these accounts. Det. Zone testified that gang members posted common phrases, emojis, and images of each other that allowed him to identify members of the gang, including Washington.

{¶ 5} Det. Zone then testified about Washington's alleged criminal activity, including the April 27, 2023 convenience-store shooting. Det. Zone provided Washington's date of birth as July 5, 2005, making him 17 years old when this shooting occurred. He explained that Washington used a gun that had been modified to permit automatic firing.

{¶ 6} Det. Zone testified about several exhibits concerning the convenience-store shooting. One such exhibit was an image that was posted on Washington's Instagram account on April 27, 2023 ("the Instagram photo"). It appears to show a black male wearing a black "COVID mask," a black track suit with white stripes along the sleeve and pant leg, and black shoes on which the word "Balenciaga" is printed in multiple locations in white text.

{¶ 7} Det. Zone also obtained video recorded on April 27, 2023, from a doorbell camera at a home next to the convenience store. This video shows four people, including one that Det. Zone identified as Washington, jog down a sidewalk. Det. Zone concluded that the person in the video was Washington because he wore the "exact same outfit" as the person in the Instagram photo. The person in the video that Det. Zone identified as Washington appears to be a black male. He is wearing a black facial covering, a black tracksuit with white stripes on the sleeve and pant leg, and black shoes with white markings. This individual carries a gun and, upon reaching a row of bushes at the corner of the home, fires gunshots in multiple bursts, which are audible in the video.

{¶ 8} Det. Zone also obtained footage from a security camera at the convenience store. The video, recorded on April 27, 2023, shows the convenience store's parking lot. The video has no audio. In the video, several people enter and exit the store and appear to converse in the store's parking lot. Also in the parking lot are several parked cars, including a white SUV. An individual appears to converse with the SUV's driver through the car's driver's side window.

{¶ 9} After several minutes, an individual ("the first shooter") jogs around a row of bushes along the corner of a home next to the store, with his arms extended. He appears to fire multiple gunshots, as clouds of dust spray from the ground and the store's exterior. Many of the people in the parking lot flee, including into the store.

{¶ 10} Seconds later, another person ("the second shooter") jogs around the bushes near the home, also with his arms extended. Det. Zone identified this person, who was wearing all black, accented with white stripes, as Washington. He stands on the driver's side of the white SUV, behind it and to the right. When the second shooter appears, three victims remain in the parking lot. One runs into the store. One remains seated in the driver's seat of the white SUV. The other crouches behind the hood of that same car. He raises his head, as though to view the shooters. The second shooter appears to fire multiple gunshots. The first shooter runs away, passing behind a bush. The second shooter continues to fire. A cloud of dust sprays from the surface of the parking lot near the SUV's hood, the person hiding behind

the hood, and the vehicle's driver. The second shooter moves back behind the bushes, and the SUV drives away. At this point, the driver's window is seen open.

{¶ 11} Following hearing, on October 25, 2023, the court found probable cause as to all charges, including attempted murder. The court also found that Washington was 17 years old at the time of the convenience-store shooting. Noting that attempted murder is a category-one offense, requiring mandatory bindover, the court transferred the case to the Cuyahoga County Court of Common Pleas, General Division.[1]

{¶ 12} On November 7, 2023, the grand jury returned a 130-count indictment against 16 defendants, including Washington. Washington was charged with 22 counts, including one count of participating in a criminal gang from on or about September 1, 2022, to November 6, 2023, in violation of R.C. 2923.42(A); six counts of attempted murder related to the convenience-store shooting on April 27, 2023, in violation of R.C. 2923.02/2903.02(A); and, one-, three-, five- and/or six-year firearm specifications in connection with many of the counts.

### B. Motions for Continuance and Attempt to Replace Court-Appointed Counsel

{¶ 13} On November 17, 2023, Washington was declared indigent and counsel was appointed.

---

[1] R.C. 2152.02(AA)(2) (defining "[c]ategory one offense" to include "a violation of section 2923.02 of the Revised Code involving an attempt to commit . . . murder"); R.C. 2152.10(A)(1)(a) (requiring mandatory bindover upon a finding of probable cause for a category-one offense that occurred when the individual charged was at least 16 years old).

{¶ 14} Trial was to occur on July 24, 2024. That same day, Washington moved for a continuance, to which the State did not object. The court granted Washington's motion and reset trial for August 19, 2024.

{¶ 15} On August 19, 2024, Washington filed a motion for continuance to allow "newly retained counsel to prepare an adequate defense in light of the serious charges pending against him." That same day, private counsel for Washington filed a notice of appearance. The court continued trial to the next day.

{¶ 16} On August 20, 2024, the court denied Washington's motion for continuance. Private counsel withdrew from the case. Appointed counsel continued to represent Washington.

### C. Guilty Plea and Attempt to Withdraw Plea

{¶ 17} Also on August 20, 2024, Washington pled guilty to criminal-gang activity, a felony of the second degree, in violation of R.C. 2923.42(A); two counts of felonious assault, felonies of the second degree, in violation of R.C. 2903.11(A)(2), with one five-year firearm specification under R.C. 2941.146; four counts of having weapons while under disability, felonies of the third degree, in violation of R.C. 2923.13(A)(1); two counts of attempted murder, felonies of the first degree, in violation of R.C. 2923.02/2903.02(A), with one six-year and one one-year firearm specification under R.C. 2941.144 and 2941.141; improperly handling firearms in a motor vehicle, a felony of the fourth degree, in violation of R.C. 2923.16(B); and discharge of a firearm on or near a prohibited premises, a felony of the third degree,

in violation of R.C. 2923.162(A)(3), with a three-year firearm specification under R.C. 2941.145.

{¶ 18} On September 23, 2024, Washington filed a "Notice of Intent to Withdraw His Previously Entered Guilty Plea." The court held a hearing on September 26, 2024, at which the parties discussed Washington's desire to withdraw his guilty plea. The court heard from the State, Washington, and his attorney and reviewed the transcript of the plea colloquy. The court did not permit Washington to withdraw his guilty plea.

**D. Sentencing and Appeal**

{¶ 19} Also on September 26, 2024, the court sentenced Washington on the four firearm specifications, to run consecutively to one another, for a mandatory prison term of 15 years. Regarding the remaining underlying offenses, Washington was sentenced to a prison term of 3-4.5 years under the Reagan Tokes Law, to run consecutively to the firearm specifications, for a total aggregate prison term of 18-19.5 years.

{¶ 20} Washington appealed, raising the following assignments of error:

1. The trial court erred when it accepted appellant's guilty plea after failing to advise on the effect of a guilty plea during the Crim.R. 11 plea colloquy.

2. The trial court erred in denying appellant's motion to withdraw plea.

3. The trial court erred in finding probable cause and ordering the mandatory bindover.

4. The trial court abused its discretion in denying a continuance which effectively denied appellant of his Sixth Amendment right to counsel.

## II. Law and Analysis

{¶ 21} For ease of analysis, we will address Washington's assignments of error out of order.

### A. Assignment of Error No. 2 — Denial of Request to Withdraw Guilty Plea

{¶ 22} Washington asserts that the court should have granted his presentence request to withdraw his guilty plea. We disagree.

{¶ 23} Crim.R. 32.1 addresses motions to withdraw a guilty plea, which "may be made only before sentence is imposed; but to correct manifest injustice the court after sentence may set aside the judgment of conviction and permit the defendant to withdraw his or her plea." While presentence motions to withdraw a guilty plea "'should be freely and liberally granted,'" a defendant "'does not, however, have an absolute right to withdraw'" a guilty plea before sentencing. *State v. Barnes*, 2022-Ohio-4486, ¶ 13, quoting *State v. Xie*, 62 Ohio St.3d 521, 527 (1992).

{¶ 24} "'We review a trial court's ruling on a motion to withdraw a guilty plea for an abuse of discretion.'" *State v. Bradley*, 2025-Ohio-2675, ¶ 12 (8th Dist.), quoting *State v. Hines*, 2020-Ohio-663, ¶ 7 (8th Dist.). An abuse of discretion occurs when a court exercises "its judgment, in an unwarranted way, in regard to a matter over which it has discretionary authority." *Abdullah v. Johnson*, 2021-Ohio-3304, ¶ 35. An abuse of discretion "'implies that the court's attitude is unreasonable, arbitrary or unconscionable.'" *W.A.F.P., Inc. v. Sky Fuel Inc.*, 2024-Ohio-3297, ¶ 13 (8th Dist.), quoting *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶ 25} When determining whether a trial court abused its discretion in denying a motion to withdraw a presentence guilty plea, this court considers the following factors:

> (1) whether the prosecution would be prejudiced if the plea were vacated; (2) whether the offender was represented by highly competent counsel; (3) the extent of the Crim.R. 11 hearing; (4) whether there was a full hearing on the motion to withdraw the offender's guilty plea; (5) whether the trial court gave full and fair consideration to the motion; (6) whether the motion was made within a reasonable time; (7) whether the motion set forth specific reasons for the withdrawal; (8) whether the accused understood the nature of the charges and possible penalties; and (9) whether the accused was perhaps not guilty or had a complete defense to the crime.

*State v. Jones*, 2018-Ohio-2055, ¶ 32 (8th Dist.), citing *State v. Zimmerman*, 2010-Ohio-4087, ¶ 13. "Consideration of these factors is a balancing test and no single factor is conclusive." *Id.*, citing *id.*

{¶ 26} Considering these factors, we do not find that the trial court abused its discretion in denying Washington's presentence request to withdraw his guilty plea. The court held a hearing on Washington's request, at which Washington was represented. Though Washington's written notice of intent did not identify a reason he sought to withdraw his guilty plea, at the hearing, Washington stated that he wanted to withdraw his plea because he was "misled." According to Washington, his lawyers told him he was "taking a plea for 15 [years]." He maintained that he would not have taken the plea if he had known he was not guaranteed a sentence of 15 years.

{¶ 27} The court indicated it had obtained a copy of the transcript from the plea hearing, "so it's abundantly clear what was said and what wasn't said." The State reminded the court that, at the plea hearing, "we had the plea agreement on the Mondopad and then the defendant had — has now even, a TV screen on the trial table, and the plea agreement was on there as well so he could read it in front of him. So it was verbally placed on the record and he could follow along in writing."

{¶ 28} The transcript of the August 20, 2024 plea hearing does not support Washington's claim that he was misled regarding his minimum sentence. After the plea was described on the record, the State explained, "I have expressed to the defense that if Defendant were to plead that there would be 15 years of specifications on this. His minimum sentence on the underlying will be three years." The court went on to inform Washington of the counts to which he would plead guilty, of their classifications, and of the associated prison terms, all of which Washington represented that he understood. The court then asked:

> And do you understand, also, that since you're pleading guilty to firearm specifications, that the firearm specifications must be run prior to and consecutive to the underlying offense, and also, firearm specifications make prison time mandatory? And also the firearm specifications, as the State outlined, have to be run consecutive to one another. So that means that you have a minimum prison sentence of 12 years — of 15 years with the firearm specifications and they all have to be run consecutive to one another and then consecutive to the underlying offense. Do you understand that?

Washington responded that he did understand.

{¶ 29} The court confirmed that no promises had been made to Washington regarding his sentence. First, the court asked if any threats or promises had been

made to Washington, "other than what was stated in open court and on the record?" Washington responded, "No, your honor." The court then asked, "[D]o you understand that there's no promise of a particular sentence?" Washington responded, "Yes, your honor." The court further confirmed, "[Y]ou understand that sentencing is up to the Court and so the Court doesn't make any promises, whatsoever, as to what your sentence will be. Do you understand that?" Washington answered, "Yes, your honor." Finally, the court asked again, "So there's no promises of a particular sentence, so you understand that, right?" Washington answered, "Yes, your honor."

{¶ 30} When taking his plea, the court specifically asked Washington how he chose to plead to each of the four gun specifications to which he pled guilty. For example, the court asked, "How do you plead to the five-year drive-by shooting firearm specification?" Washington responded, "I plead guilty, your honor." The court repeated the question as relates to the six-year, one-year, and three-year gun specifications.

{¶ 31} The information provided Washington at his plea hearing and the opportunities afforded him to inquire if he did not understand are inconsistent with the reason he gave for seeking to withdraw his plea. The trial court did not abuse its discretion in denying Washington's request to withdraw his plea based on his claim that he had been misled about the sentence he would receive.

{¶ 32} Washington argues on appeal that the trial court abused its discretion when it did not take testimony regarding whether trial counsel was "highly

competent." We do not find that this factor alone is sufficient to justify overturning the trial court's decision. The court's decision is supported by the extent of the Crim.R. 11 hearing; the full hearing afforded Washington on his request to withdraw the plea; the court's full and fair consideration of the motion; the fact that the request itself did not offer any reason; Washington's participation at the plea hearing demonstrating he understood the nature of the charges against him and possible penalties; and Washington's failure to proffer a complete defense to all of the charges against him. Even if the court could have inquired more fully into counsel's competency, weighing the factors demonstrates the trial court did not err in denying Washington's request to withdraw his plea.

{¶ 33} Accordingly, assignment of error No. 2 is overruled.

### B. Assignment of Error No. 1 — Advisement of the Effect of a Guilty Plea Under Crim.R. 11

{¶ 34} Washington asserts that the court failed to advise him that his guilty plea was a complete admission of guilt. For this reason, he argues that his plea should be vacated.

{¶ 35} "Crim.R. 11 outlines the procedures that trial courts are to follow when accepting pleas." *State v. Dangler*, 2020-Ohio-2765, ¶ 11. The rule requires "'the trial court to personally inform the defendant of his rights and the consequences of his plea and determine if the plea is understandingly and voluntarily made.'" *Id.*, quoting *State v. Stone*, 43 Ohio St.2d 163, 168 (1975).

{¶ 36} Crim. R. 11(C)(2) provides that a court shall not accept a guilty plea without first:

(a) Determining that the defendant is making the plea voluntarily, with understanding of the nature of the charges and of the maximum penalty involved, and if applicable, that the defendant is not eligible for probation or for the imposition of community control sanctions at the sentencing hearing.

(b) Informing the defendant of and determining that the defendant understands the effect of the plea of guilty or no contest, and that the court, upon acceptance of the plea, may proceed with judgment and sentence.

(c) Informing the defendant and determining that the defendant understands that by the plea the defendant is waiving the rights to jury trial, to confront witnesses against him or her, to have compulsory process for obtaining witnesses in the defendant's favor, and to require the state to prove the defendant's guilt beyond a reasonable doubt at a trial at which the defendant cannot be compelled to testify against himself or herself.

{¶ 37} "[T]rial courts need not recite Crim.R. 11(C) verbatim . . . . 'Rather, the focus, upon review, is whether the record shows that the trial court explained or referred to the right in a manner reasonably intelligible to th[e] defendant.'" *State v. Grayer*, 2019-Ohio-3511, ¶ 12 (8th Dist.), quoting *State v. Ballard*, 66 Ohio St.2d 473, 479 (1981). "[W]hen a trial court fails to fully cover . . . 'nonconstitutional' aspects of the plea colloquy, a defendant must affirmatively show prejudice to invalidate a plea." *Dangler* at ¶ 14, *accord State v. Davner*, 2017-Ohio-8862, ¶ 42 (8th Dist.) ("If the trial court partially complied" with nonconstitutional aspects of CrimR. 11(C)(2), "the plea is properly vacated only if the defendant demonstrates prejudice."). The test for prejudice is "'whether the plea would have otherwise been made.'" *Dangler* at ¶ 16, quoting *State v. Nero*, 56 Ohio St.3d 106, 108 (1990). An "exception to the prejudice requirement" applies in the event of "a trial court's

*complete* failure to comply with a portion of Crim.R. 11(C)," which "eliminates the defendant's burden to show prejudice." *Dangler* at ¶ 15.

{¶ 38} Regarding a court's obligation to inform a defendant about the effect of a guilty plea and determine that he understands same, Crim.R. 11(B)(1) states that a guilty plea is "a complete admission of the defendant's guilt." "The right to be informed that a guilty plea is a complete admission of guilt is nonconstitutional. . . ." *State v. Griggs*, 2004-Ohio-4415, ¶ 12.

{¶ 39} "[W]here a trial court does not explicitly state that a guilty plea constitutes a complete admission of guilt during a Crim.R. 11 colloquy but the court otherwise complies with the rule and the defendant does not assert actual innocence, we may presume that the defendant understood that his guilty plea was a complete admission of guilt." *State v. Fontanez*, 2024-Ohio-4579, ¶ 9 (8th Dist.) (en banc). In *Fontanez*, that "guilty" meant "a complete admission of guilt" during a plea colloquy was "self-evident" based on the word's plain meaning, common use in the English language, and "from the plea colloquy itself." *Id.* at ¶ 13-14.

{¶ 40} We review compliance with Crim.R. 11(C) de novo, considering the totality of the circumstances. *State v. Niyonzima*, 2025-Ohio-1185, ¶ 9 (8th Dist.). "'De novo review encompasses an independent examination of the record and law without deference to the underlying decision.'" *Torres v. Concrete Designs, Inc.*, 2019-Ohio-1342, ¶ 48 (8th Dist.), quoting *Gateway Consultants Group, Inc. v. Premier Physicians Ctrs., Inc.*, 2017-Ohio-1443, ¶ 22 (8th Dist.).

{¶ 41} We find neither complete nor prejudicial failure by the court to inform Washington about the effect of his guilty plea. Washington has not asserted actual innocence and, as in *Fontanez*, it is evident from the plea colloquy itself that Washington's guilty plea was a complete admission of guilt. The court's statements and Washington's eliminate other reasonable conclusions.

{¶ 42} Regarding the impact of pleading guilty, the court and Washington had the following exchange:

Q: Do you understand you'll be waiving rights by pleading guilty today?

A: Yes, your Honor.

Q: I'll go through all of your trial rights with you.

{¶ 43} The court then informed Washington that he had the rights listed in Crim.R. 11(C)(2)(c) — to a jury trial, to confront witnesses against him, to compel witnesses to testify in his favor, to have the State prove his guilt beyond a reasonable doubt, and not to testify. Washington asserted, one by one, that he understood he waived these rights by pleading guilty.

{¶ 44} The court also informed Washington that it could "proceed with judgment and sentence [him] immediately after your plea today," as required by Crim.R. 11(C)(2)(b). Washington again stated that he understood.

{¶ 45} Under Crim.R. 11(C)(2)(a), the court informed Washington of the felonies to which he was pleading guilty, of their classifications, and of the maximum penalties associated. Washington again told the court that he understood.

{¶ 46} As discussed in response to assignment of error No. 2, neither the court's statements nor Washington's support his claim that he mistakenly believed he would receive a minimum prison term of 15 years. We again note that the court informed Washington that he would receive a minimum prison term of 15 years on the firearm specifications and that they would run consecutively to the underlying offenses, which the court had previously laid out. The record indicates that this information was also presented to Washington in writing via a Mondopad. The court asked, "Do you understand that?" Washington responded, "Yes, your honor." The court also told Washington, repeatedly, that it made no promise of a particular sentence, which Washington replied that he understood. Even still, Washington received the minimum potential sentence under the plea agreement. And despite numerous opportunities, Washington never expressed confusion during the hearing regarding the charges against him, potential sentences, or the effect of a guilty plea. As part of the plea agreement, 11 of the charges against Washington were dismissed.

{¶ 47} In light of the plain meaning and common use of the word "guilty," and given the totality of the circumstances surrounding the plea hearing, that "guilty" meant "a complete admission of guilt" was self-evident. Consequently, following *Fontanez*, we presume that the defendant understood that his guilty plea was a complete admission of guilt. We find neither complete nor prejudicial failure by the court to inform Washington about the meaning of a guilty plea under Crim.R. 11(B)(1), as would require vacating his convictions.

{¶ 48} Accordingly, assignment of error No. 1 is overruled.

### C. Assignment of Error No. 3 — Finding of Probable Cause and Order of Mandatory Bindover

{¶ 49} Washington asserts that the court erred in transferring this case to the General Division of the Cuyahoga County Court of Common Pleas. Washington argues that the State failed to provide sufficient credible evidence to support the court's finding of probable cause regarding attempted murder.

{¶ 50} R.C. 2152.10(A)(1)(a) states that a case involving an allegedly delinquent child "shall be transferred" to adult court upon a probable-cause finding regarding a category-one offense committed when an offender was at least 16 years old. A category-one offense includes a violation of R.C. 2923.02 involving an attempt to commit murder. R.C. 2152.02(AA)(2).

{¶ 51} To establish probable cause in a bindover proceeding, the State "'must provide credible evidence that raises more than a mere suspicion of guilt,'" but "'need not provide evidence proving guilt beyond a reasonable doubt.'" *State v. Carter-El*, 2025-Ohio-4842, ¶ 57 (8th Dist.), quoting *In re J.R.*, 2021-Ohio-2272, ¶ 31 (8th Dist.). The court must evaluate whether the State has presented "credible evidence going to each element of the offense charged." *In re J.R.* at ¶ 33, citing *State v. Iacona,* 93 Ohio St.3d 83, 93 (2001).

{¶ 52} "The juvenile court presiding over a probable-cause hearing does not sit as the ultimate trier of fact." *State v. Martin*, 2022-Ohio-4175, ¶ 31. "Questions regarding the greater weight of the evidence must be reserved for final adjudication on the merits." *Id.*

{¶ 53} "Whether the State has produced sufficient evidence to support a finding of probable cause in a mandatory-bindover proceeding is a question of law, and [is reviewed] de novo." *Cartel-El* at ¶ 56 , quoting *In re A.J.S.*, 2008-Ohio-5307, ¶ 1. "We defer to the juvenile court's determinations regarding witness credibility, reviewing those determinations for abuse of discretion." *Id.*, quoting *State v. Shirilla*, 2024-Ohio-4674, ¶ 151 (8th Dist.).

{¶ 54} Washington argues that the State did not introduce sufficient credible evidence that he participated in the shooting. We disagree. The shooter in the doorbell-camera video wore clothing consistent with the outfit worn by the individual in the Instagram photo. Det. Zone testified that this photo was posted to Washington's Instagram account on the day of the shooting. The shooter and the individual in the Instagram photo wore a black jacket and black track pants, with white stripes down the sleeve and pant leg, and black shoes with white markings.

{¶ 55} Washington also argues that the State did not introduce sufficient credible evidence in support of its allegation that he acted with specific intent to kill. He argues that the shooters fired at the ground and that the victims were not in the plain view of the second shooter in the convenience store video, who the State identified as Washington.

{¶ 56} Ohio's attempt statute, R.C. 2923.02, states that "[n]o person, purposely or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, shall engage in conduct that, if successful, would constitute or result in the offense." R.C. 2903.02 prohibits purposely causing the

death of another. Taken together, to establish probable cause regarding attempted murder, the State needed to produce credible evidence that Washington "purposely engaged in conduct that, if successful, would have caused the death of another." *In re A.J.S*, 2008-Ohio-5307, at ¶ 52.

{¶ 57} "'[I]ntent to kill may be presumed where the natural and probable consequence of the wrongful act done is to produce death.'" *In re A.J.S.* at ¶ 53, quoting *State v. Robinson*, 161 Ohio St. 213, 218 (1954). "[A] firearm is an inherently dangerous instrument, the use of which is likely to produce death, coupled with relevant circumstantial evidence." *State v. Lucas*, 2020-Ohio-1602, ¶ 71 (8th Dist.). "'The act of pointing a firearm and firing it in the direction of another human being is an act with death as a natural and probable consequence.'" *Id.*, quoting *State v. Brown*, 1996 Ohio App. LEXIS 801, *6 (8th Dist. Feb. 29, 1996). In determining whether an offender acted with specific intent to kill, courts also consider "the nature of the instrument used and the lethality of the instrument." *Id.*, citing *State v. Barrow*, 2015-Ohio-525, ¶ 16 (8th Dist.).

{¶ 58} Washington claims that the State failed to present credible evidence that he acted with specific intent to kill because the shooters "fired at the ground." We disagree. The State presented evidence that weighs in favor of a conclusion that, although no bullets struck the victims, the second shooter intended for them to do so.[2] In the store's security video, the second shooter fires bullets from across the

---

[2] We make no finding as to the greater weight of the evidence on this question of fact, which, as discussed above, is outside the scope of a bindover proceeding. *Martin*, 2022-Ohio-4175, at ¶ 31.

parking lot that appear to land several feet from the hood of the white SUV, its driver, and the victim behind the car. Under these circumstances, the proximity between the bullet's landing place and human victims is consistent with an intent to kill.

{¶ 59} We next address Washington's argument that, by the time the second shooter arrived at the parking lot, no victims were in plain view. This court has found that sufficient evidence of specific intent to kill supported an attempted-murder conviction where a defendant fired a gun in the direction of a victim, who was not harmed, despite testimony indicating that the shooter could not see the victim.[3] *Lucas* at ¶ 73-76. In *Lucas*, the defendant fired a gun through the window of his ex-girlfriend's bedroom. The bullet "passed over the victim's bed," in which she was sleeping, but did not strike her. *Lucas* at ¶ 73. A shooting reconstruction expert testified that the blinds were closed when the shot was fired and that "it would have been extremely difficult, if possible at all, for the shooter to see exactly where he or she was shooting into the bedroom." *Id.* at ¶ 76. This conclusion was further supported by the victim's testimony that the shooting occurred "in the middle of the night," after she had gone to sleep. *Id.* at ¶ 13.[4]

---

[3] The *Lucas* Court's conclusion that the record contained sufficient evidence of specific intent to kill was based in part on motive evidence concerning the defendant's tumultuous relationship with the victim. *Lucas* at ¶ 77-79. However, as discussed above, the evidence necessary to establish probable cause need not amount to that which would be required to support a finding of guilt beyond a reasonable doubt.

[4] Relatedly, a detective testified that, based on the timing of the victim's 911 call, he concluded that the shooting occurred "a couple of minutes before" 2:40 a.m. *Lucas* at ¶ 81.

{¶ 60} We find that the court's probable-cause finding was supported by sufficient credible evidence of specific intent. As in *Lucas*, even if no victims were plainly visible to the second shooter, a factfinder would not be precluded from determining that he acted with intent to kill by firing in the direction of the SUV in which a driver was present and behind which another individual was hiding. Also notable is that Washington fired repeatedly in the direction of a commercial storefront. It was apparent that people were present during the shooting: a victim entered the store through its front door after the second shooter arrived at the scene, and multiple cars were in the parking lot.

{¶ 61} Further, aspects of the store's security video suggest that the second shooter may have been able to see the individuals inside and behind the white SUV.[5] The victim inside the SUV sat in the driver's seat, on the same side of the car as the second shooter. There is some evidence that the window next to her seat was open, as could have made her more easily visible from outside the car. Before the shooting, an individual appears to speak to the victim through the window, which is later seen open as the car drives away. Also, after the second shooter arrives, the victim hidden behind the car raises his head multiple times as though to view his assailants. This action may have made him visible to the second shooter.

{¶ 62} Evidence regarding the lethality of the second shooter's weapon also suggests that the second shooter acted with specific intent to kill. The doorbell-

---

[5] Again, we do not resolve this question of fact. *Martin*, 2022-Ohio-4175, at ¶ 31.

camera video shows that he discharged multiple bursts from a gun that Det. Zone testified allowed automatic firing.

{¶ 63} Given the foregoing, the State introduced sufficient credible evidence that Washington acted with specific intent to kill to support the court's probable-cause finding regarding attempted murder. We do not find that the court erred in ordering bindover. Accordingly, assignment of error No. 3 is overruled.

### D. Assignment of Error No. 4 — Denial of Motion for Continuance

{¶ 64} Washington asserts that the court erred in denying his motion to continue trial, in connection with his attempt to replace his court-appointed attorney with private counsel. Washington argues that, absent a continuance, private counsel did not have adequate time to prepare for trial. Under these circumstances, Washington reasons, he had no choice but to proceed with his court-appointed lawyer, which he contends deprived him of his right to counsel under U.S. Const., amend. VI.

{¶ 65} In all criminal prosecutions, the accused shall enjoy the assistance of counsel for his defense. U.S. Const., amend. VI. The "essential aim" of the Sixth Amendment "is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." *State v. Nicholson*, 2007-Ohio-6653, ¶ 12 (8th Dist.); *Wheat v. United States*, 486 U.S. 153, 159 (1988). "A trial court's decision to grant or deny continuance of a trial is reviewed by this court under an abuse-of-discretion

standard." *State v. Adkisson*, 2024-Ohio-964, ¶ 11 (8th Dist.), citing *State v. Unger*, 67 Ohio St.2d 65 (1981); *State v. Sowders*, 4 Ohio St.3d 143 (1983).

{¶ 66} "Factors to consider in deciding whether a trial court erred in denying a defendant's motion to substitute counsel include the timeliness of the motion and whether there was a conflict between the attorney and the client that was so great that it resulted in a total lack of communication preventing an adequate defense." *Nicholson* at ¶ 12, citing *State v. Jones*, 91 Ohio St.3d 335, 342 (2001). "A defendant's request to substitute retained counsel of his choice must be timely and not disrupt the trial proceedings." *Nicholson* at ¶ 14.

{¶ 67} In *Nicholson*, a criminal defendant moved to "terminate his retained counsel" on the day of trial, which the court treated as "a motion to continue." *Id.* at ¶ 16. The court denied the motion, reasoning that the defendant had "never voiced any dissatisfaction with his retained counsel until the morning of the trial." *Id.* at ¶ 15. This court found that, under these circumstances, denial of defendant's motion did not amount to an abuse of discretion. *Id.* at ¶ 19, *accord State v. Jackson*, 2023-Ohio-455, ¶ 62 (8th Dist.) (Trial court's denial of defendant's requests for continuance and substitute counsel did not amount to an abuse of discretion where "there was no indication prior to the day of trial that he was dissatisfied with his attorney.").

{¶ 68} "Although 'a trial court has a duty to investigate reasons behind a defendant's request for a change of counsel,' this duty only arises if the allegations

are 'sufficiently specific.'" *Jackson* at ¶ 63 (8th Dist.), quoting *State v. Phillpott*, 2020-Ohio-5267, ¶ 24-25 (8th Dist.).

{¶ 69} We do not find that the court abused its discretion in denying Washington's motion for continuance. The court had granted Washington a continuance the month prior. On August 19, 2024, the day trial was scheduled to begin, private counsel for Washington filed a notice of appearance and a request for continuance. We find no indication that Washington expressed discontent with his appointed attorney — who had represented him for nine months — prior to this date. Even then, the record does not demonstrate that any conflict existed between Washington and his appointed attorney. Nor do we identify any reason that Washington gave the court for wanting new counsel.

{¶ 70} Accordingly, assignment of error No. 4 is overruled.

{¶ 71} Judgement affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's convictions having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
LISA B. FORBES, PRESIDING JUDGE

SEAN C. GALLAGHER, J., and
ANITA LASTER MAYS, J., CONCUR